IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HAMAD LEWIS, On Behalf of Himself and All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 3:23-cv-00896 ) |
| HALL MANAGEMENT GROUP, et al., | ) JUDGE RICHARDSON ) |
| Defendants. | ) ) ) |

# MEMORANDUM OPINION AND ORDER

In this action under the Fair Labor Standards Act, pending before the Court is "Defendants' Motion to Compel Arbitration and Dismiss or Alternatively Stay Proceedings" (Doc. No. 15, "Motion to Compel Arbitration") filed by Defendants, Hall Management Group, LLC and Halls Nashville, LLC d/b/a Halls Chophouse (collectively referred to herein, in the singular, as "Halls"). In its supporting Memorandum, Halls argues that the sole named plaintiff (i.e., Hamad Lewis, hereinafter "Named Plaintiff"),[1] and all the other individuals who submitted opt-in Notices signaling their intention to join this lawsuit ("Opt-in Plaintiffs") prior to the date the Motion to Compel Arbitration was filed,[2] must arbitrate their claims because (according to Halls) they each

---

[1] Generally, the Court herein uses "Lewis" when referring to the alleged actions and circumstances underlying his claims, and uses "Named Plaintiff" when referring to his actions taken as a litigant (through his attorneys). Notably, because the docket reflects that Named Plaintiff alone (as opposed the Named Plaintiff together with one or more of the Opt-in Plaintiffs) is identified as the filer of the plaintiff-side litigative documents herein, the Court herein refers to the litigating party as "Named Plaintiff" even though Named Plaintiff goes to bat not just for himself but for all Plaintiffs.

[2] After briefing on the Motion to Compel Arbitration was completed, Consents to Sue were filed respectively for two additional persons. (*See* Doc. Nos. 22). These persons are not within the scope of the term "Opt-In Plaintiffs" (or "Plaintiffs") as used herein, but to the extent that Halls hereafter attempts to

signed a valid and binding Arbitration Agreement at that time they were employed by Halls. (Doc. No. 16). Named Plaintiff, on behalf of himself and at least purportedly also on behalf of Opt-in Plaintiffs, opposes the Motion to Compel Arbitration on the basis that there is a genuine dispute of material fact as to the existence of the purported Arbitration Agreements for himself and each of the respective Opt-in Plaintiffs (all referred to herein collectively as "Plaintiffs"). (Doc. No. 19).

## I. PROCEDURAL HISTORY

Named Plaintiff commenced this action by filing a "Class and Collective Action Complaint" (Doc. No. 1) on August 23, 2023, asserting claims against Halls to recover unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, and for breach of contract under state law. Named Plaintiff alleges that Halls employed him as a server at a Nashville restaurant and that Halls paid him and other servers less than the minimum wage by using a so-called tip credit to satisfy the minimum wage requirement contained in the FLSA when, for various reasons, Halls was not legally entitled to use a tip credit. (*Id.* at 2). Named Plaintiff sought to bring the FLSA claim as a collective action and the state breach-of-contract claim as a Rule 23 class action. Within a few weeks after the Complaint was filed, Consents to Sue had been filed for nine respective Opt-in Plaintiffs. (*See* Doc. Nos. 8, 11).

Shortly after filing the Complaint, Named Plaintiff filed a Motion for Expedited, Court-Authorized Notice to Potentially Similarly Situated Employees. (Doc. No. 13). Even before responding to that motion (which remains pending), Halls filed the Motion to Compel Arbitration. Since the filing of the Motion to Compel Arbitration, as noted above in a footnote, respective Consents to Sue were filed on behalf of three additional Opt-in Plaintiffs. (Doc. Nos. 22, 36).

---

compel these three individuals to arbitration (an attempt that would need to be supported by information specific to these three individuals), the analysis herein may prove applicable to such attempt).

## II. LEGAL STANDARDS

The Federal Arbitration Act (FAA) provides that a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract…shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."[3] *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (internal citation and quotation omitted). On the other hand, "[t]he Court recognizes that 'equal footing' does not mean 'preferential footing.'" *Townsend v. Pinewood Soc., LLC*, No. 3:24-CV-00003, 2024 WL 1642790, at *9 n.6 (M.D. Tenn. Apr. 16, 2024).

Under the FAA, if a party establishes the existence of a valid agreement to arbitrate, the district court must grant the party's motion to compel arbitration and stay proceedings until the completion of arbitration.[4] *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing 9 U.S.C. §§ 3-4). Importantly, to say that there is a *valid* agreement to arbitrate is to say two separate things: (i) that an agreement to arbitrate was concluded (i.e., that arbitration was agreed to at least to some extent and under certain conditions); and (ii) that the (actually existing) agreement was valid (i.e., legally binding rather than void for some reason). *See Rent-A-Ctr., W.,*

---

[3] The Court recognizes that "equal footing" does not mean "preferential footing."

[4] *Glazer* also indicated that the district court had the option, as an alternative to staying the case pending arbitration, of dismissing the case. But that option was recently foreclosed by the United States Supreme Court. See Smith v. Spizzirri, 601 U.S. 472, 478 (2024) (holding that Section 3 of the FAA "overrides any discretion a district court might otherwise have had to dismiss a suit when the parties have agreed to arbitration" and that "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay [rather than dismiss] the proceeding.").

*Inc. v. Jackson*, 561 U.S. 63, 70 n.1 (2010) ("The [issue of the] *validity* of a written agreement to arbitrate [is] whether it is legally binding, as opposed to whether it was in fact agreed to."); *id.* at 71 n.2 ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded[.]'"). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983).

Where a party seeks to compel arbitration, a court must begin its analysis by looking to the procedures set forth in the FAA. *See Proch v. King*, No. 2:22-CV-12141, 2023 WL 4940527, at *2 (E.D. Mich. May 5, 2023), report and recommendation accepted in relevant part, *Proch v. King*, No. 22-12141, 2023 WL 4936695, at *3 (E.D. Mich Aug. 2, 2023) ("*Boykin* explained that the FAA itself, not the Rules of Civil Procedure, provide the starting point for determining how a party should invoke the FAA…That is because the FAA supplants conflicting Federal Rules of Civil Procedure."). "Although the [FAA] requires a court to summarily compel arbitration upon a party's request, the court may do so only if the opposing side has not put the making of the arbitration contract 'in issue.'" *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832, 835 (6th Cir. 2021) (citing 9 U.S.C. § 4). To decide whether the existence of an agreement to arbitrate is actually "in issue," courts use the summary judgment standard. *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 881 (6th Cir. 2021) (noting that "Rule 56's standards govern whether a court should hold a trial under § 4 when a party alleges that no contract exists."). In accordance with Rule 56, the court views "all facts and inferences drawn therefrom in the light most favorable" to the party opposing arbitration and "determine[s] whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). "The party asserting the existence of a contract

must first produce evidence, such as a signed agreement, that would support a reasonable jury's finding that a contract exists. The party contesting the existence of a contract must then present specific facts that would allow a reasonable jury to conclude that no contract was formed." *Structures USA, LLC v. CHM Indus., Inc.*, No. 3:21-cv-458-BJB-LLK, 2022 WL 882166, at *3 (W.D. Ky., Mar. 24, 2022) (citing *Boykin*, 3 F.4th at 839) (internal citation omitted). *See also Boykin*, 3 F.4th at 839 (noting that the contesting party must "present 'specific facts, as opposed to general allegations,' that would allow a rational trier of fact to find that he did not acknowledge the agreement or learn about the arbitration condition of employment in other ways." (citing *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020))).

If the court finds that the making of the arbitration agreement is "in issue,"—i.e., that there is a genuine dispute of material fact as to whether the parties agreed to arbitrate—then "the court shall proceed summarily to the trial on the disputed question." 9 U.S.C. § 4. Moreover, "a party who adequately puts the formation of an arbitration contract in issue may request discovery on that contract-formation question." *Boykin*, 3 F.4th at 841. However, if the party opposing arbitration fails to show that the making of the agreement is "in issue," the court must enforce the agreement as written and order the parties to arbitration.

### III. THE PARTIES' COMPETING EVIDENCE

Due to the above-referenced standards, the Court finds it helpful to set forth the parties' competing evidence bearing on whether they respectively entered into valid Arbitration Agreements. The Court will first describe pertinent evidence presented by Halls as the movant (who bears the initial burden), then describe the evidence presented by Named Plaintiff in opposition to the Motion.

Evidentially, the Motion is supported primarily by the Declaration of Pamela Lewter, who attests that she is the Human Resources Manager for Halls. (Lewter 1st Decl., Doc. No. 15-1 ¶ 2),

as well as six exhibits to her Declaration (Doc. No. 15-2 through Doc. No. 15-7). Among other responsibilities, she is tasked with assisting with new hires at new restaurant locations. (Doc. No. 15-1 ¶ 2). In subsections (A), (B) and (D) below, the Court sets forth in pertinent part the information conveyed by Lewter's Declaration and the attachments thereto.[5] Without necessarily finding that all such information necessarily would or should be accepted as accurate by a finder of fact, the Court finds that all such information *could* be accepted as accurate and is competent evidence for purposes of assessing the instant Motion under the above-referenced standards.

In subsection (C) below, the Court sets forth in pertinent part the testimony in Plaintiffs' Declarations.[6] Without necessarily finding that all such testimony necessarily would or should be accepted as true by a finder of fact, the Court finds that all such testimony *could* be accepted as true and is competent evidence for purposes of assessing the instant Motion under the above-referenced standards.

A. <u>Halls's Evidence Concerning Halls's Onboarding Paperwork</u>

Halls employs a standardized process that applies to all new hires. First, upon acceptance of an offer of employment at a Halls restaurant, the new employee is assigned "onboarding paperwork" to complete through an online portal system. (*Id.* ¶ 3). Halls maintains, in the regular course of its business, the onboarding paperwork submitted by new hires. (*Id.*).

---

[5] For the most part, and except when perceiving some reason to do otherwise, the Court sets forth the pertinent information in subsections (A) and (B) without reminding the reader that the information is according to Lewter's Declaration and the attachments thereto.

[6] For the most part, and except when perceiving some reason to do otherwise, the Court sets forth the informational narrative without reminding the reader that the information is according to Lewter's Declaration.

A human-resources employee then enters, into Hall's online portal system, information provided by the new hire. The system then generates a unique web link and sends the link to the new hire via text message and email. (*Id.* ¶ 5).

Clicking on this link takes the new hire to a "general information page," where the new hire enters his or her name, date of birth, and social security number and is then assigned a unique username and is required to create a password. The new hire is also required to select security questions and answers to further protect access to his personal information. (*Id.* ¶ 6). The new hire then completes various onboarding documents, including the Form I-9 Employment Eligibility Verification, a W4, and consent to direct deposit of his paycheck. (*Id.* ¶¶ 7, 9). Before signing any of these documents, the new hire must review and complete the Agreement to Use Electronic Click Signature to Sign Documents. (*Id.* ¶ 8; *see also* Doc. No. 15-2 (exemplar Agreement)). To do so requires the new hire to enter his unique username and password (Doc. No. 16 at 4 (citing Doc. No. 15-1 at ¶¶ 8-9 and Ex. [15-2])).

The new hire must then review the Information Sheet About the Arbitration Agreement ("Information Sheet"). (Doc. No. 15-1 ¶ 10; *see also* Doc. No. 15-4 (exemplar Information Sheet)). The Information Sheet explains what the Arbitration Agreement is, notifies the employee that he or she has thirty days within which to opt out of the Arbitration Agreement, explains how to exercise that opt-out option, and informs the employee that unless he or she opts out, "any disputes arising out of or related to your employment will be resolved under the binding Arbitration Agreement." (Doc. No. 15-4). The Information Sheet also states, in bold, capitalized font:

> **IF YOU HAVE ANY QUESTIONS ABOUT THE INFORMATION IN THIS DOCUMENT OR ABOUT THE MUTUAL AGREEMENT FOR THE ARBITRATION OF DISPUTES PLEASE CONTACT JIM WAHLSTROM AT 843-724-3808 EXT. 124 OR JWAHLSTROM@HALLMANAGEMENTGROUP.COM.**

(*Id.*). The employee must sign the Information Sheet, signifying receipt thereof. (Doc. No. 15-1. ¶ 10).

The new hire is then required to review the Arbitration Agreement and to initial each page before signing it. (*Id.* ¶ 11–12). The Arbitration Agreement is six pages long, with the Acknowledgment of Arbitration and signature page on page seven. (Doc. No. 15-5). "Covered Claims" are defined on page two as including

> Any claim, dispute, and/or controversy under federal, state, or local laws regarding payment of wages, compensation practices, or benefit plans, including, but not limited to, claims for payment or demand for reimbursement of alleged expenses relating to employment with the Company. Said claims may arise under federal law, including but not limited to the Fair Labor Standards Act ("FLSA"), the Employee Retirement Income Security Act ("ERISA"), or any state wage payment laws . . . .

(*Id.* at 3).

On page six, in the paragraph titled Waiver of Jury Trial, the following language appears in bold, capitalized letters:

> **EMPLOYEE AND THE COMPANY UNDERSTAND THAT BY ENTERING INTO THIS ARBITRATION AGREEMENT, BOTH GIVE UP THEIR RIGHT TO TRIAL BY JURY OF ANY INDIVIDUAL, CLASS, COLLECTIVE ACTION, MULTIPLE-PARTY, PRIVATE ATTORNEY GENERAL, OR OTHER CLAIM EITHER MAY HAVE AGAINST THE OTHER, EXCEPT AS EXPRESSLY PROVIDED HEREIN.**

(*Id.* at 7).

Following that paragraph, the Arbitration Agreement again provides information regarding the employee's "right to opt out of the obligation set forth in this Arbitration Agreement to submit to binding arbitration" and explains the procedure for opting out. (*Id.*).

On page seven, just above the signature blocks, the Arbitration Agreement states as follows, again in block letters:

## ACKNOWLEDGMENT OF ARBITRATION

I UNDERSTAND THAT THIS ARBITRATION AGREEMENT CONTAINS AN AGREEMENT TO ARBITRATE. AFTER SIGNING THIS DOCUMENT, I UNDERSTAND THAT I WILL NOT BE ABLE TO BRING A LAWSUIT CONCERNING ANY DISPUTE THAT MAY ARISE WHICH IS COVERED BY THE ARBITRATION AGREEMENT. MY SIGNATURE BELOW ATTESTS TO THE FACT THAT I HAVE READ, UNDERSTAND, AND AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS. I UNDERSTAND THAT, UNLESS I TIMELY SEND THE OPT-OUT LETTER REFERENCED ABOVE TO THE PROPER ADDRESSEE, I WILL BE REQUIRED TO ARBITRATE ALL DISPUTES WITH THE COMPANY THAT ARE COVERED BY THIS ARBITRATION AGREEMENT, I ALSO UNDERSTAND THAT THIS ARBITRATION AGREEMENT CONTAINS A WAIVER OF JURY TRIAL.

(*Id.* at 8).

B. <u>Halls's Evidence Concerning Plaintiffs' Respective Onboarding Processes</u>

Lewis interviewed for employment with Halls in April 2022 and was offered a job at Halls's Nashville restaurant. (Doc. No. 15-1 ¶ 15). His first day of work was May 16, 2022. At some point prior to that, he had provided his cell phone number and email address to a human resources employee, who entered that information into Halls' system on May 11, 2022. (*Id.*). The system then sent Lewis a unique link for him to complete his onboarding paperwork the same day. (*Id.*).

Lewter was working at Halls's Nashville restaurant on May 16 and 17, 2022 and was assisting with onboarding. (*Id.* ¶¶ 16–17). When Lewis began work on May 16, among other onboarding activities, Lewter reminded him that he needed to complete the onboarding paperwork, which he had not yet done. (*Id.* ¶ 18). To maintain employment at Halls, all new employees are required to complete the onboarding paperwork within three days of the date of hire. (*Id.* ¶ 19). She specifically recalls that Lewis was on a list of employees who had not completed their paperwork and that he was taken off the list as of May 18, 2022. (*Id.*).

Lewter specifically avers, based on Halls' records, that Lewis signed all of his onboarding paperwork, including the Information Sheet and Arbitration Agreement, on May 18, 2022. (*Id.* ¶¶ 10, 20). Copies of all of his onboarding documentation, including the signed Information Sheet and the initialed and signed Arbitration Agreement, are attached as exhibits to Lewter's Declaration. (Doc. Nos. 15-4, 15-5). Lewter also avers that Lewis never provided notice that he was opting out of the Arbitration Agreement. (Doc. No. 15-1 ¶ 23).

Each of the nine Opt-in Plaintiffs (Elizabeth Gharavi, Kelicia Weaver, Kirollos Daniel, Dustin Herres, Charles Lee, Christopher Nicholson, William Sandahl, Tami Snell, and Blake Strebel) likewise completed onboarding paperwork and likewise signed Information Sheets and Arbitration Agreements at the time they were hired, and that Halls' records do not reflect that any of them ever exercised their right to opt out of the Arbitration Agreements. (*Id.* ¶ 24). Copies of the Information Sheets and Arbitration Agreements purportedly signed by the Opt-in Plaintiffs are also attached as exhibits to Lewter's First Declaration. (Doc. Nos. 15-6, 15-7).

        C.      <u>Plaintiffs' Evidence Concerning Their Respective Onboarding Processes</u>

In support of his response to the Motion to Compel Arbitration, Named Plaintiff refers to his Declaration and the Declarations submitted respectively by the Opt-in Plaintiffs. (Doc. No. 19 at 1). In his Declaration, Named Plaintiff attests as follows regarding the existence of an Arbitration Agreement between him and Halls:

> 4. I understand that Halls Chophouse claims that I entered into an arbitration agreement with them by signing the purported agreement electronically around the time when I was hired in May 2022. I do not recall signing any documents for Defendants electronically.
>
> 5. I did not agree with Halls Chophouse to arbitrate any claims against the companies.
>
> 6. Prior to my lawyers telling me about the purported arbitration agreement, I had never seen it or heard about it before.

> 7. I have searched my emails for communications from Halls Chophouse about the purported arbitration agreement, and Defendants never sent me a copy of the purported arbitration agreement.
>
> 8. While I worked for Defendants, no one in management at Halls Chophouse ever mentioned the purported arbitration agreement or that I would be giving up my right to sue collectively in court if I agreed to it or that by continuing to work for Defendants I might be agreeing to arbitrate claims against Halls Chophouse or that the purported arbitration agreement has an opt-out procedure for employees who do not want to be bound by it.
>
> 9. If I had known about the opt-out procedure in the purported arbitration agreement, I would have utilized it.

(Doc. No. 18-3 (Named Plaintiff Decl.)). The respective Declarations of each of the (nine) Opt-in Plaintiffs are basically consistent with Named Plaintiff's Declaration, and all assert that the individuals "did not agree with Halls Chophouse to arbitrate any claims against [it]." (*See* Doc. Nos. 18-1 (Daniel Decl.), 18-2 (Herres Decl.), 18-4 (Nicholson Decl.), 19-1 (Gharavi Decl.), 19-2 (Lee Decl.), 19-3 (Sandahl Decl.), 19-4 (Snell Decl.), 19-5 (Strebel Decl.); 19-6 (Weaver Decl.)).[7] Nicholson further states that, "[t]o the best of [his] recollection," Halls's managers "filled in all [his] tax and immigration forms and electronically signed any required onboarding forms for [him]." (Doc. No. 18-4 ¶ 7). Kelicia Weaver's Declaration adds an assertion that because she had a prior job where she learned sometime later that she "had signed an arbitration agreement as part of [her] onboarding without knowing it," she now pays attention to onboarding documents and does not sign documents without reading them. (Doc. No. 19-6 ¶¶ 5-7).

---

[7] Daniel, Herres, Lee, and Sandahl attest that when they were hired, they did not know what the term "arbitration" meant. (Doc. No. 18-1 ¶ 6; Doc. No. 18-2 ¶ 6; Doc. No. 19-2 ¶ 6; Doc. No. 19-3 ¶ 6). Herres, Lee, and Strebel remember signing some documents electronically, but "none of them involved entering [into] the purported arbitration agreement." (Doc. No. 18-2 ¶ 7; Doc. No. 19-2 ¶ 7; Doc. No. 19-5 ¶ 6). Snell remembers signing some documents electronically but "do[es] not remember signing the purported arbitration agreement." (Doc. No. 19-4 ¶ 4).

D.  Halls's Additional Evidence Concerning Onboarding, Both Generally and as to Plaintiffs.

In her Second Declaration, filed in response to the Named Plaintiff's and the Opt-in Plaintiffs' Declarations, Pamela Lewter again avers that all employees hired by Halls are required to sign onboarding paperwork using Halls' online portal system and that the onboarding paperwork is always completed in the same sequence, with the Information Sheet and Arbitration Agreement following immediately after the Form I-9 and before the other documents. (Doc. No. 20-1 ¶ 3). Lewter also avers that the online portal provides Halls with signature timestamps for all onboarding documents signed by new employees. (*Id.*). Based on Halls' records, Lewter identifies the respective dates and times on which Plaintiffs electronically signed the Information Sheet and the Arbitration Agreement. (*Id.* ¶¶ 5–14; *see also* Doc. No. 21-1).

IV.  **ANALYSIS**

In *Townsend,* this Court recently decided a case similar to the one at hand. Here, as in that case:

> The issue before the Court is whether Plaintiff[s] ha[d] "adequately put in 'issue' " under the standards of Rule 56 whether he accepted the Agreement.[7] *Boykin*, 3 F.4th at 839. The Parties do not dispute that Tennessee law is applicable to determine whether they formed a contract, or that Tennessee law would permit Plaintiff[s] to accept the Agreement by electronically signing it. The Parties dispute only whether Plaintiff[s] actually signed (or, for that matter, received) the Agreement.

*Townsend*, 2024 WL 1642790, at *4. Notably, Tennessee's Uniform Electronic Transactions Act states that "a record or signature may not be denied legal effect or enforceability solely because it is in electronic form." Tenn. Code Ann. § 47-10-107(a).

Via the two Declarations of Pamela Lewter and the copies of Arbitration Agreements that were signed electronically, Halls has carried its initial burden—which the Court perceives to be Plaintiff-specific—of showing that each of the Plaintiffs signed Arbitration Agreements and never

exercised their right to opt out of those agreements. Halls also asserts that (1) Tennessee law permits parties to electronically sign arbitration agreements; (2) the Arbitration Agreements were supported by sufficient consideration; (3) the Arbitration Agreements apply to Plaintiffs' wage claims under the FLSA and state law; and (4) the Arbitration Agreements operate as valid waivers of Plaintiffs' right to a jury trial on their claims. (Doc. No. 16). Thus, the burden—which, again, the Court perceives to be Plaintiff-specific—shifts to Named Plaintiff to show the existence of a genuine issue of material fact. To meet this burden with respect to any particular one of the Plaintiffs, Named Plaintiff must present "specific facts, as opposed to general allegations," from which a reasonable trier of fact could find that such Plaintiff did not execute the Agreement. *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020). If a factual dispute exists, the parties may request an extension of time and permission to "seek targeted discovery on the disputed contract-formation questions," but "any discovery must comport with [9 U.S.C.A.] § 4, which calls for a *summary trial*—not death by discovery." *Boykin*, 3 F.4th at 844 (internal quotation marks and citations omitted).

As set forth above, each of the Plaintiffs have all submitted Declarations in which he or she attests unequivocally that:

(1) he or she did not agree to arbitrate claims against Halls;

(2) he or she had never seen or heard of the supposed arbitration agreement that Halls seeks to enforce prior to the filing of its Motion to Compel Arbitration;

(3) he or she were never informed by Halls of the agreement or that by continuing to work for Halls they might be agreeing to arbitrate; and

(4) he or she never received from Halls copies of any such agreement.

(*See* Doc. Nos. 18-1, 18-2, 18-3, 18-4, 19-1, 19-2, 19-3, 19-4, 19-5, 19-6). Named Plaintiff points to other evidence in the record that he claims tends to corroborate Plaintiffs' assertions, including Nicholson's statement that a member of Halls' management staff completed onboarding

paperwork for him, including "sign[ing] any required onboarding documents for me." (Doc. No. 18-4 ¶ 7); Weaver's statement that, having unknowingly signed an agreement to arbitrate disputes with a former employer, she now carefully reads any documents before she signs them (Doc. No. 19-6 ¶7); and the fact that Halls' employee handbook and training manual (Doc. Nos. 14-7, 14-8) do not mention arbitration. Named Plaintiff asserts that this evidence is sufficient to create a material factual dispute as to whether Plaintiffs actually accepted the Arbitration Agreements so as to form a valid contract. Notably, he does not contend that the Arbitration Agreements as produced by Halls (if they were in fact entered into) are insufficient to give notice of the waiver of a jury trial, that they are without adequate consideration, or that they do not cover the claims at issue in this case. Instead, the only material fact as to which Named Plaintiff seeks to establish a genuine issue is Plaintiffs' respective entry into an arbitration agreement with Halls.

In Halls' Reply, Halls contends that Plaintiffs have not offered sufficient evidence to create a genuine dispute as to that fact. The court disagrees. As the Sixth Circuit explained in *Boykin*, to create a "genuine" dispute as to whether [s]he accepted an agreement (that, in whole or in part, calls for arbitration), a plaintiff "need[s] to present 'specific facts, as opposed to general allegations,' that would allow a rational trier of fact to find that [s]he did not acknowledge the agreement or learn about the arbitration condition of employment in other ways." *Boykin*, 3 F.4th at 839 (quoting *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020)). While on the one hand, "[c]onvenient memory lapses do not create factual disputes that are genuine," on the other hand, "an unequivocal denial that takes the form of admissible evidence can create a genuine dispute of fact." *Id.* at 840 (citations and internal quotation marks omitted). In the instant case, Named Plaintiff does not state merely that he does not "recall" signing an arbitration agreement. He also states unequivocally that he "did not agree with Halls Chophouse to arbitrate any claims against the companies," that he had

never seen or even heard about the arbitration agreement before his lawyers in this case told him about it, and that, if he had known about the opt-out procedure, he would have used it. (Doc. No. 18-3 ¶¶ 5–6, 9). The Opt-in Plaintiffs attest similarly, as noted above.

The facts of this case are also similar to those in *Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795 (6th Cir. 2023), in which the defendant pointed to an "e-Form record of the arbitration agreement" that showed the plaintiff's name "typed at the bottom with an electronic signature 'By UserID: 467073,'" which the defendant claimed was the plaintiff's user ID. *Id.* at 798. In response to this record, the plaintiff submitted a "sworn declaration in which he repeatedly said that he never saw the arbitration agreement." *Id.* The Sixth Circuit held that it could "see no reason whatever that would prevent a reasonable factfinder from believing [the plaintiff's] testimony—which means that his testimony created a genuine issue of material fact." *Id.*

So too here. Although the evidence presented by Lewter is compelling, at this juncture the Court must view the evidence presented in the light most favorable to Plaintiffs and accept as true Plaintiffs' statements that they never saw the respective Arbitration Agreements until Halls filed its Motion to Compel Arbitration and that they never agreed to arbitrate any wage disputes with Halls. *See id.* ("Bazemore's testimony that he never saw the agreement was therefore enough to create a genuine issue as to whether he signed it.").

Defendant attempts to distinguish *Bazemore* by stating that "[P]laintiffs, here, fail to offer any evidence that questions the validity of their signatures as was the case in *Bazemore*[.]" (Doc. No. 20 at 5). Defendant here is referring to the declaration of the plaintiff in *Bazemore* that "his login credentials 'were clearly made up of demographic information' available from his application, and that he had seen his manager log in for Bazemore and other delivery drivers 'to complete training materials' for them[.]" 74 F.4th at 797. The Court is not persuaded that these

declared facts were necessary (even if helpful) to the decision in *Bazemore*, because they were not necessary to support the Court's ultimate rationale: "Yet *Bazemore* submitted a sworn declaration in which he repeatedly said that he never saw the arbitration agreement . . . [w]e see no reason whatever that would prevent a reasonable factfinder from believing Bazemore's testimony." *Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795, 798 (6th Cir. 2023). The key testimony from the plaintiff's declaration was that he never saw an arbitration agreement, not his testimony regarding his login credentials.

Additionally, a Declaration of one of the Opt-in Plaintiffs asserts that Halls's management staff applied his electronic signature to onboarding documents for him. This suggests that it was not only the new hire that could access and apply the electronic signature, thus undercutting Defendant's argument that an electronic signature is undeniable proof that a Plaintiff in fact did agree to arbitrate. This suggestion is further bolstered by the statement from another Opt-in Plaintiff that, due to a prior experience, she specifically checks employment contracts for arbitration agreements. While it is not always true that a denial of an electronic signature will be sufficient to create a genuine issue of material fact as to whether the individual signed the document, *cf. Bazemore*, 2024 WL 1642790 at *6 ("the undisputed electronic audit trail show[s] that Plaintiff signed the Agreement, such that no reasonable jury could believe Plaintiff's denial"),[8]

---

[8] Indeed, *Townsend* highlights distinguishing characteristics of a case in which a denial of an electronic signature is not sufficient. There, the defendant produced an arbitration agreement that had what purported to be the plaintiff's electronic signature on the bottom of it. *Townsend*, 2024 WL 1642790, at *2. The plaintiff, in a sworn declaration, "unequivocally denied" ever signing the agreement based on his memory and personal review of the relevant documents in his possession. *Id.* at *5. The defendant offered a declaration from the Chief Operating Officer of the company providing the portal system. *Id.* at *4. According to the declaration, the reports showed the precise date and times when the plaintiff accessed the portal and changed his password and when the agreement was linked to a signature action. *Id.* at *5. Further, the IP address of the user who signed the agreement matched the IP address from which the plaintiff accessed the portal initially. *Id.* The Court held that the plaintiff's denial was not sufficient to create a genuine dispute of material fact and noted that the reports tracing the agreement to the plaintiff were detailed and offered by a third party. *Id.* at *6–7.

it is true here; based on the facts currently before the Court, Named Plaintiff has established a genuine issue as to whether Plaintiffs accepted the arbitration agreements.

Because a material factual dispute exists here as to the creation of binding agreements, the Court now must ask, "[w]here does our conclusion that a fact dispute exists leave things?" *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 844 (6th Cir. 2021). The answer comes from the FAA, which "requires the district court to 'proceed summarily to the trial' of the disputed fact questions." *Id.* (citing 9 U.S.C. § 4). Although Named Plaintiff argues, in a somewhat perfunctory manner, that the Court should proceed to address his Motion for Expedited, Court-Authorized Notice to Potentially Similarly Situated Employees before resolving the arbitration issue, the Sixth Circuit has stated that "[t]he parties may not address other issues, including merits issues, before the court resolves these formation questions and [the employer's] motion to compel." *Id.* (citations omitted). The Court will hold in abeyance its decision on the Motion to Compel Arbitration, pending an expedited hearing to resolve the factual dispute addressed herein. *See id.* at 837, 844.

## V. CONCLUSION

The Court will hold an expedited hearing, as delineated above, that will be scheduled in a separate order. If the parties believe targeted discovery is necessary prior to that hearing, the parties may file, within one week of the entry of this order, a motion to continue explaining why such discovery is helpful. A decision on the Motion for Expedited, Court-Authorized Notice to

---

Though Defendant does have precise records as to the date and time when the Opt-in Plaintiffs purportedly signed the onboarding documents, its reports are not as extensive as the reports in *Townsend*. (Doc. No. 20-1 ¶ 3). Beyond the timestamps, Defendant does not offer an electronic audit trail comparable to the evidence provided by the defendant in *Townsend*, which included timestamps, a record of the signature action being linked to the agreement, and reports matching the IP of the user who signed the agreement to the IP address that the plaintiff used to access the portal. 2024 WL 1642790, at *5. Further, Defendant's reports and processes are attested to by Lewter, its own Human Resources Manager, whereas the defendant in *Townsend* provided the declaration of a third party to vouch for its reports. (Doc. No. 15-1 ¶ 2); 2024 WL 1642790, at *6.

Potentially Similarly Situated Employees (Doc. No. 13) will be held in abeyance until after the Court rules on the Motion to Compel Arbitration.

The motion to ascertain status (Doc. No. 37) is DENIED as moot in light of the entry of this Order.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE